04/254-2
B01

1 DENIS R. SALMON, SBN 072500
  SALLY J. BERENS, SBN 218880
2 JOSEPH W. GUZZETTA, SBN 233560
  GIBSON, DUNN & CRUTCHER LLP
3 1881 Page Mill Road
  Palo Alto, California 94304
4 Telephone: (650) 849-5300
  Facsimile: (650) 849-5333

5

6 Attorneys for Defendant
  ADVANCED DIGITAL BROADCAST
  HOLDINGS SA

7

ORIGINAL
FILED

08 JAN 11 PH 3: 30

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST OF CA. S.J.

8     UNITED STATES DISTRICT COURT

9    NORTHERN DISTRICT OF CALIFORNIA

10

11 ANDREW GRZEGOREK,   **C08. 00212 PVT**

          CASE NO.

12    Plaintiff,   **NOTICE TO PLAINTIFF OF REMOVAL**
          **TO FEDERAL COURT**

13   v.

          **[Santa Clara Superior Court**
14 ADVANCED DIGITAL BROADCAST **Case No. 1-07-CV-096891]**
  HOLDINGS SA, a Swiss corporation (formerly
15 Advanced Digital Broadcast Limited, a
  corporation of British Virgin Islands) , and DOES
16 1-50,

17    Defendants.

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

            1

NOTICE TO PLAINTIFF OF REMOVAL TO FEDERAL COURT

F 1-11-08

**TO PLAINTIFF ANDREW GRZEGOREK AND HIS ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT defendant Advanced Digital Broadcast Holdings SA filed a Notice of Removal of the above-referenced action from the Superior Court of the State of California for the County of Santa Clara to the United States District Court for the Northern District of California on January 11, 2008. A copy of the Notice of Removal is attached to this Notice, and is served herewith.

DATED: January 11, 2008

GIBSON, DUNN & CRUTCHER LLP

By: _____

Sally J. Berens

Attorneys for Defendant
ADVANCED DIGITAL BROADCAST
HOLDINGS SA

100369083_1.DOC

Gibson, Dunn &
Crutcher LLP

NOTICE TO PLAINTIFF OF REMOVAL TO FEDERAL COURT

# Exhibit A

1  DENIS R. SALMON, SBN 072500
   SALLY J. BERENS, SBN 218880
2  JOSEPH W. GUZZETTA, SBN 233560
   GIBSON, DUNN & CRUTCHER LLP
3  1881 Page Mill Road
   Palo Alto, California 94304
4  Telephone: (650) 849-5300
   Facsimile: (650) 849-5333

5

   Attorneys for Defendant
6  ADVANCED DIGITAL BROADCAST
   HOLDINGS SA

7

8              SUPERIOR COURT OF THE STATE OF CALIFORNIA

9                        COUNTY OF SANTA CLARA

10

11  ANDREW GRZEGOREK,                      CASE NO. 1-07-CV-096891

12            Plaintiff,                   **NOTICE OF FILING OF NOTICE OF
                                           REMOVAL**
13        v.

14  ADVANCED DIGITAL BROADCAST
    HOLDINGS SA, a Swiss corporation (formerly
15  Advanced Digital Broadcast Limited, a
    corporation of British Virgin Islands), and DOES
16  1-50,

17            Defendants.

18

19

20

21

22

23

24

25

26

27

28

1    **TO THE CLERK OF THE ABOVE-ENTITLED COURT AND TO PLAINTIFF AND**

2    **HIS ATTORNEYS OF RECORD:**

3        PLEASE TAKE NOTICE THAT defendant Advanced Digital Broadcast Holdings SA filed a

4    Notice of Removal of this action in the United States District Court for the Northern District of

5    California on January 11, 2008, removing this action from the Superior Court of the State of

6    California for the County of Santa Clara to the United States District Court for the Northern District

7    of California, under Federal Case Number C08-00212.  A copy of the Notice of Removal is
                                              PVT

8    attached hereto as Exhibit A and fully incorporated herein by this reference.

9    DATED:  January 11, 2008                    GIBSON, DUNN & CRUTCHER LLP

10

11                                              By: _____
                                                          Sally J. Berens
12

13                                              Attorneys for Defendant
                                                ADVANCED DIGITAL BROADCAST
14                                              HOLDINGS SA

15    100369084_1.DOC

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

NOTICE OF FILING NOTICE OF REMOVAL

1

## PROOF OF SERVICE

2

I am employed in the City of Palo Alto, County of Santa Clara, State of California.  I am over

3

the age of 18 years and am not a party to this action.  My business address is 1881 Page Mill Road,

4

Palo Alto, California  94304, in said County and State.  On January 11, 2008, I served the following:

5

### NOTICE OF FILING OF NOTICE OF REMOVAL

6

7

by placing a true copy thereof in an envelope addressed to each of the persons named below at the

8

address shown:

9

Ernest M. Malaspina, Esq.
Noelle R. Dunn, Esq.

10

Hopkins and Carley
P.O. Box 1469

11

San Jose, CA  95109-1469

12

13

   X    **BY U.S. MAIL:**  I placed a true copy in a sealed envelope addressed as indicated
 —    above, on the above-mentioned date.  I am familiar with the firm's practice of

14

collection and processing correspondence for mailing.  It is deposited with the U.S.
Postal Service on that same day in the ordinary course of business.  I am aware that on

15

motion of party served, service is presumed invalid if postal cancellation date or
postage meter date is more than one day after date of deposit for mailing in affidavit.

16

___    **BY PERSONAL SERVICE:**  I placed a true copy in a sealed envelope addressed to
each person[s] named at the address[es] shown and giving same to a messenger for

17

personal delivery before 5:00 p.m. on the above-mentioned date.

18

___    **BY FACSIMILE:**  From facsimile machine telephone number (650) 849-5333, on the
above-mentioned date, I served a full and complete copy of the above-referenced

19

document[s] by facsimile transmission to the person[s] at the number[s] indicated.

20

I declare under penalty of perjury under the laws of the State of California that the foregoing

21

is true and correct and that the foregoing document(s) were printed on recycled paper.

22

23

Executed at Palo Alto, California, on January 11, 2008.

24

_____
Karen Leonard

25

100369252_1.DOC

26

27

28

Gibson, Dunn &
Crutcher LLP

# EXHIBIT A

1   DENIS R. SALMON, SBN 072500
    SALLY J. BERENS, SBN 218880
2   JOSEPH W. GUZZETTA, SBN 233560
    GIBSON, DUNN & CRUTCHER LLP
3   1881 Page Mill Road
    Palo Alto, California 94304
4   Telephone: (650) 849-5300
    Facsimile: (650) 849-5333
5
    Attorneys for Defendant
6   ADVANCED DIGITAL BROADCAST
    HOLDINGS SA
7
8                    UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10
11  ANDREW GRZEGOREK,                    C 08    00212    PVT

12          Plaintiff,                   CASE NO.

13      v.                               NOTICE OF REMOVAL OF ACTION
                                         UNDER 28 U.S.C. § 1441
14  ADVANCED DIGITAL BROADCAST
    HOLDINGS SA, a Swiss corporation (formerly    [Santa Clara Superior Court
15  Advanced Digital Broadcast Limited, a          Case No. 1-07-CV-096891]
    corporation of British Virgin Islands), and DOES
16  1-50,

17          Defendants.

18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP
                                         1

**TO THE CLERK OF THE ABOVE-ENTITLED COURT AND TO PLAINTIFF AND HIS ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. § 1441(a), defendant Advanced Digital Broadcast Holdings SA ("Advanced Digital") hereby removes this entire civil action, and all claims and causes of action included therein, from the Superior Court of the State of California in and for the County of Santa Clara (the "Superior Court") to the United States District Court for the Northern District of California on the basis of diversity jurisdiction, as more fully set forth below.

1.     On October 18, 2007, plaintiff Andrew Grzegorek ("Grzegorek") commenced an action in the Superior Court of the State of California in and for the County of Santa Clara, entitled *Andrew Grzegorek, Plaintiff, v. Advanced Digital Broadcast Holdings SA, and Does 1-50, Defendants* as Case Number 1-07-CV-096891. A copy of the complaint in that action is attached hereto as Exhibit A.

2.     On December 14, 2007, Grzegorek served a copy of the complaint, a summons from the Superior Court, and a Request for Service Abroad of Judicial or Extrajudicial Documents on Advanced Digital at its headquarters in Chambésy, Switzerland. A copy of the summons is attached hereto as Exhibit B. A copy of the Request for Service Abroad of Judicial or Extrajudicial Documents is attached hereto as Exhibit C.

## I.     JURISDICTION

3.     As set forth herein, this action is a civil action of which this Court has original jurisdiction under 28 U.S.C. § 1332, and is one that may be removed to this Court by Advanced Digital pursuant to the provisions of 28 U.S.C. § 1441(a), because it is a civil action between a citizen of California and a citizen of a foreign state, and the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

4.     Advanced Digital is informed and believes that Grzegorek was, and still is, a citizen of the State of California. See Exhibit A ¶ 1.

5.     Advanced Digital was, at the time of the filing of this action, and still is, a corporation organized under the laws of the Swiss Confederation, having its principal place of business in

Chambésy, Switzerland, and is the only defendant that has been served a summons and complaint in this action. See Exhibit A ¶¶ 2, 4. Advanced Digital is not a citizen of California.

6.     Grzegorek's complaint seeks damages exceeding $75,000. See Exhibit A ¶¶ 37, 45, 52, 74.

## II.    INTRADISTRICT ASSIGNMENT

7.     Pursuant to 28 U.S.C. § 1446(a), a Notice of Removal must be filed "in the district and division within which such action is pending." In this case, the division within which the state court action is pending is San Jose because the state court action is pending in the Superior Court of the State of California for the County of Santa Clara. See Civil L.R. 3-2(e).

## III.    CERTIFICATION OF INTERESTED PARTIES

8.     Pursuant to Civil Local Rule 3-16, the undersigned certifies that as of this date, other than the named parties, there is no such interest to report.

9.     Advanced Digital is represented by the undersigned, who certifies, pursuant to Rule 11 of the Federal Rules of Civil Procedure, that the foregoing is true and correct.

WHEREFORE Advanced Digital removes this entire civil action, and all claims and causes of action included herein, from the Superior Court of the State of California in and for the County of Santa Clara to this Court.

DATED: January 11, 2008

GIBSON, DUNN & CRUTCHER LLP

By: _____
                                    Sally J. Berens

Attorneys for Defendant
ADVANCED DIGITAL BROADCAST
HOLDINGS SA

100369039_1.DOC

Gibson, Dunn &
Crutcher LLP

NOTICE OF REMOVAL – 28 U.S.C. § 1441

# EXHIBIT A

1  Ernest M. Malaspina (State Bar No. 187946)
   Noelle R. Dunn (State Bar No. 226913)
2  HOPKINS & CARLEY
   A Law Corporation
3  The Letitia Building
   70 S. First Street
4  San Jose, CA 95113-2406

5  *mailing address:*
   P.O. Box 1469
6  San Jose, CA 95109-1469
   Telephone:  (408) 286-9800
7  Facsimile:  (408) 998-4790

8  Attorneys for Plaintiff
   ANDREW GRZEGOREK

9

ENDORSED

2007 OCT 18 P 3: 22

10          SUPERIOR COURT OF THE STATE OF CALIFORNIA

11             COUNTY OF SANTA CLARA

12  ANDREW GRZEGOREK,                    CASE NO. 1 0 7 C V 0 9 6 8 9 1

13          Plaintiff,                   COMPLAINT FOR DAMAGES FOR:

14      v.                              1.  Breach of Contract (failure to issue Pre-
                                            IPO Shares);
15  ADVANCED DIGITAL BROADCAST          2.  Breach of Contract (failure to issue
    HOLDINGS SA, a Swiss corporation        Discounted Shares);
16  (formerly Advanced Digital Broadcast 3. Breach of Contract (failure to pay
    Limited, a corporation of British Virgin  severance package);
17  Islands), and DOES 1-50,           4.  Breach of Contract (failure to provide
                                            pension benefits);
18          Defendants.                 5.  Breach of the covenant of good faith and
                                            fair dealing;
19                                      6.  Unfair Business Practices; and
                                        7.  Quantum Meruit
20

21

22                          **INTRODUCTION**

23      1.      Plaintiff Andrew Grzegorek (hereafter referred to as "Plaintiff") is an individual

24  residing in the County of Santa Clara, State of California, and is employed by defendant

25  Advanced Digital Broadcast Limited.

26      2.      Plaintiff is informed and believes that Defendant Advanced Digital Broadcast

27  Holdings SA (hereafter referred to as "ADB") is a Swiss corporation doing business in the County

28  of Santa Clara, State of California.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE

591\521640.3

COMPLAINT FOR DAMAGES

1    3.    Plaintiff is ignorant of the true names and capacities of the defendants sued herein

2    as Does 1 through 50, inclusive, and therefore sue those defendants by fictitious names. Plaintiff

3    will amend this complaint to allege the true names and capacities of those defendants as soon as

4    they are ascertained. Plaintiff is informed and believes that each fictitiously named defendant is

5    responsible in some way for the events and damages described herein.

## FACTUAL ALLEGATIONS

7    4.    ADB is headquartered in Chambesy, Switzerland and has offices in Australia,

8    Israel, Italy, Poland, Spain, Switzerland, Taiwan, Thailand, the Ukraine, the United Kingdom and

9    the United States. ADB produces digital television products, including digital set-top boxes for

10    all television transmission platforms and digital video recorders.

11    5.    On or around May 26, 2000, Plaintiff entered into an employment contract with

12    Advanced Digital Broadcast Limited, a corporation of the British Virgin Islands (the "Company").

13    A copy of the Contract of Employment entered into between Plaintiff and the Company is

14    attached hereto as Exhibit "A" and incorporated herein by reference.

15    6.    Pursuant to the Contract of Employment, Plaintiff was to be employed by the

16    Company as its Director of Advanced Engineering and to be paid a base salary of $145,002.00 per

17    year. The term of the contract was open. *See* Exhibit A at ¶ 4.

18    7.    The Contract of Employment stated that Plaintiff was entitled to the following

19    option of the Company's shares: (a) a number of shares equivalent to US $666,666, calculated on

20    the basis of company valuation by an independent underwriter, within 3 months before the initial

21    public offering ("IPO") – free of charge (the "Pre-IPO Shares"); and (b) a number of shares

22    equivalent to US $666,666, calculated in the same manner as the Pre-IPO Shares, at a 50%

23    discount of the share issue price (the "Discounted Shares"). Plaintiff was to vest in 25% of both

24    the total Pre-IPO Shares and the total Discounted Shares at the end of each year following the

25    year of the IPO. *See* Exhibit A at ¶ 8(b), (c).

26    8.    Under the Contract of Employment, Plaintiff was also eligible to participate in the

27    Company's Pension Plan administered by Eagle Star International, on the same level as senior

28

1    management of ADB Ltd., Taiwan Branch. *See* Exhibit A at ¶ 10(b). To date, however, Plaintiff

2    has not been enrolled in the Company's Pension Plan.

3        9.    The Contract of Employment stated that, in the event that Plaintiff was terminated

4    by the Company for any reason other than criminal misconduct, or if the Company decided to

5    close its facility in the San Francisco Bay Area, the Company would pay Plaintiff a severance

6    package in the amount of one year of salary less the amount of $44,520.00. In addition, Plaintiff

7    would become fully vested in all Company stocks. *See* Exhibit A at ¶ 13(a).

8        10.    Since on or about July 1, 2000, Plaintiff has performed his duties as the Director of

9    Advanced Engineering for the Company in accordance with the terms of the Contract of

10    Employment. Throughout his employment with the Company, in recognition of his valuable

11    contributions and efforts, Plaintiff has received regular salary increases and bonuses. Pursuant to

12    his most recent salary increase, Plaintiff's annual base compensation was increased from

13    $168,909.00 to $173,400.00 in January of 2005.

14        11.    In or around December of 2004, Plaintiff was granted 12,500 shares of Company

15    stock pursuant to the ADB Employee Stock Ownership Plan dated December 30, 2004 (the

16    "ESOP Shares"). These ESOP Shares were different in several material respects from the Pre-

17    IPO Shares and the Discounted Shares that were to be issued to Plaintiff under his Contract of

18    Employment. Significantly, all of the ESOP Shares were completely restricted and could not be

19    sold for the first twelve months from the date of the IPO. The shares would then be released from

20    these restrictions and become transferable in thirds on the dates that were twelve, eighteen, and

21    thirty months following the date of the IPO. Further, if an employee were to resign or be

22    terminated with cause, the ESOP Shares could not be sold for an additional three-year period.

23    The Pre-IPO Shares and the Discounted Shares, on the other hand, were to become fully vested,

24    with no restrictions, in the event that Plaintiff was terminated by the Company for any reason

25    other than criminal misconduct, or if the Company decided to close its facility in the San

26    Francisco Bay Area. Additionally, while Plaintiff was informed in a May 17, 2005 e-mail

27    message from the Company's President, Andrew Rybicki, that the number of shares to be issued

28    to each employee pursuant to the ESOP was calculated based on a price of $3.85 per share,

1   Plaintiff was issued only 12,500 ESOP Shares. These shares, therefore, would be worth only

2   $48,125.00, far less than $666,666.00 in Pre-IPO Shares owed to Plaintiff under the express terms

3   of his Contract of Employment (which, at the specified valuation, would equal 173,160 shares).

4          12.     In a letter dated January 25, 2005, Plaintiff was informed that, pursuant to a

5   merger, the Company would become ADB, a Swiss corporation, and that the shares of Company

6   stock he had been granted through the ESOP would become shares of ADB in the same quantity

7   and of the same value.

8          13.     On March 17, 2005, Plaintiff received a memorandum entitled "ADB Share Value

9   Statement" informing him that the Swiss Tax Authority had completed the process of assessment

10  of ADB Group share value and had determined that the value of one share of ADB stock was

11  CHF 4.358832 (the "Swiss Tax Authority Valuation"). Pursuant to the Swiss Tax Authority

12  Valuation, as of March 17, 2005, Plaintiff was entitled to approximately 176,851 Pre-IPO Shares

13  and approximately 176,851 Discounted Shares.

14         14.     On or around April 28, 2005, the Company had its IPO on the Swiss Stock

15  Exchange.

16         15.     According to ADB, at the time of the IPO, a share of ADB stock was valued at

17  CHF 51 and the exchange rate was $1.1898 (the "ADB Valuation"). Pursuant to the ADB

18  Valuation, as of April 28, 2005, Plaintiff was entitled to 15,554 Pre-IPO Shares and 15,554

19  Discounted Shares.

20         16.     To date, ADB has failed to issue any of the Pre-IPO Shares or the Discounted

21  Shares owed to Plaintiff pursuant to the terms of his Contract of Employment.

22         17.     On or around December 1, 2005, Plaintiff was informed that ADB had decided to

23  close its San Francisco Bay Area office, located in Campbell, California. Plaintiff had worked out

24  of this office suite since commencing his employment with ADB in July of 2000.

25         18.     On or around December 22, 2005, Plaintiff met with Andrew Rybicki and William

26  Luehrs in Denver, Colorado (the "Denver Meeting"). The purpose of this meeting was to address

27  various outstanding issues under Plaintiff's Contract of Employment as a result of ADB's

28  decision to close its San Francisco Bay Area office.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE

591\521640.3                                    - 4 -

COMPLAINT FOR DAMAGES

1       19.   During the Denver Meeting, Mr. Rybicki and Mr. Luehrs conceded that the

2   Company needed to address the following outstanding issues under Plaintiff's Contract of

3   Employment: (a) the Pre-IPO Shares Plaintiff was owed; (b) the Discounted Shares Plaintiff was

4   owed; (c) the severance payment Plaintiff would be owed as a result of the closure of the San

5   Francisco Bay Area office; and (d) Plaintiff's continued employment status and compensation

6   going forward.

7       20.   At the Denver Meeting, ADB gave Plaintiff a written proposal for resolving these

8   issues. This proposal contained the following terms: (a) pay Plaintiff the sum of $340,000.00

9   representing 4,835 shares of ADB stock at the then current price of CHF 100 to make up for the

10   deficiency in the number of Pre-IPO Shares allegedly granted to Plaintiff (claiming that the

11   12,500 ESOP Shares issued to Plaintiff constituted a portion of the Pre-IPO Shares he was owed);

12   (b) pay Plaintiff the amount of $1,100,000.00 for the Discounted Shares (assuming an exercise

13   price of CHF 110 less CHF 25.50 [the 50% discount of the IPO price] divided by the exchange

14   rate of 1.2917 multiplied by 16,885 shares); (c) pay Plaintiff severance in the amount of

15   $173,400.00 as a result of the closure of the San Francisco Bay Area office; (d) retain Plaintiff to

16   assist with special projects at an annual salary of $100,000.00; and (e) pay the total $1,600,000.00

17   owed to Plaintiff over a period of ten years (the "Denver Proposal").    The terms of the Denver

18   Proposal were unacceptable to Plaintiff and/or subsequently withdrawn by ADB and accordingly

19   no agreement ensued.

20       21.   On or around February 3, 2006, Plaintiff met with William Luehrs in Campbell,

21   California (the "Campbell Meeting"). Also present was Ken Fowler, Plaintiff's Certified Public

22   Accountant. The purpose of this meeting was to reopen the issues discussed in the Denver

23   Meeting, which remained unresolved.

24       22.   During the Campbell Meeting, Mr. Luehrs again gave Plaintiff a written proposal

25   for resolving the outstanding issues under Plaintiff's Contract of Employment. This proposal

26   contained the following terms, which were virtually identical to those proposed at the Denver

27   Meeting; (a) pay Plaintiff the sum of $340,000.00 representing 4,835 shares of ADB stock at the

28   then current price of CHF 100 to make up for the deficiency in the number of Pre-IPO Shares

1  allegedly granted to Plaintiff (claiming that the 12,500 ESOP Shares issued to Plaintiff constituted
2  a portion of the Pre-IPO Shares he was owed); (b) pay Plaintiff the amount of $1,100,000.00 for
3  the Discounted Shares (assuming an exercise price of CHF 110 less CHF 25.50 [the 50% discount
4  of the IPO price] divided by the exchange rate of 1.2917 multiplied by 16,885 shares); (c) pay
5  Plaintiff severance in the amount of $173,400.00 as a result of the closure of the San Francisco
6  Bay Area office; (d) retain Plaintiff for a five-year employment term to assist with special projects
7  at an annual salary of $100,000.00; and (e) pay the total $1,600,000.00 owed to Plaintiff over five
8  years by paying the amount of $320,000.00 into a deferred compensation plan each year of a five-
9  year period unless Plaintiff voluntarily resigned or was terminated for cause (the "Campbell
10  Proposal").  Plaintiff did not agree to the terms of the Campbell Proposal.

11         23.    On or around February 28, 2006, ADB closed its San Francisco Bay Area office.
12  As of that date, pursuant to the express terms of Plaintiff's Contract of Employment, all of the
13  Pre-IPO Shares and the Discounted Shares became fully vested, with no restrictions, and Plaintiff
14  became entitled to a severance payment in the amount of $128,880.00 (based on Plaintiff's then
15  current annual base salary of $173,400.00 less $44,520.00).  *See* Exhibit A at ¶ 13(a).  To date,
16  Plaintiff has not received any of the Pre-IPO Shares, the Discounted Shares, or the severance
17  payment he is owed.

18         24.    As a result of ADB's failure to timely issue the Pre-IPO Shares and the Discounted
19  Shares to Plaintiff, Plaintiff lost the opportunity to exercise these shares when they became fully
20  vested on February 28, 2006 and were trading at a rate of CHF 142.9 per share.  Based on the
21  number of shares to which Plaintiff was entitled under the ADB Valuation, the Pre-IPO Shares
22  were then valued at approximately $1,695,398.00 and the Discounted Shares were then valued at
23  approximately $1,392,860.00, for a total of $3,088,258.00.  Based on the number of shares to
24  which Plaintiff was entitled under the Swiss Tax Authority Valuation, the Pre-IPO Shares were
25  then valued at approximately $19,276,893.00 and the Discounted Shares were then valued at
26  approximately $18,982,896.00, for a total of $38,259,789.00.

27         25.    Since the closure of ADB's San Francisco Bay Area office, Plaintiff has continued
28  to perform his usual and customary duties for ADB as its Director of Advanced Engineering out

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE

591\521640.3

- 6 -

1    of his home in San Jose, California.

2         26.   On or around March 1, 2006, ADB unilaterally eliminated multiple contractual

3    benefits and decreased Plaintiff's annual base salary to $100,000.00. ADB has withheld multiple

4    contractual benefits and compensated Plaintiff at this reduced salary, without Plaintiff's consent,

5    ever since.

6         27.   On or around April 14, 2006, Plaintiff met with William Luehrs in Palo Alto,

7    California (the "Palo Alto Meeting"). The purpose of this meeting was to follow up on the issues

8    discussed in the Denver and Campbell Meetings, which remained unresolved.

9         28.   During the Palo Alto Meeting, ADB again made Plaintiff a proposal for resolving

10   the outstanding issues under his Contract of Employment. The terms of this proposal were

11   different from the terms proposed in the Denver and Campbell Meetings in that all references to

12   severance pay were excluded, all monetary amounts in USD were adjusted downward due to a

13   drop in value as against CHF (the "Palo Alto Proposal"), and entitlement to certain vested

14   contractual benefits were made contingent upon continued employment with ADB. Plaintiff did

15   not agree to the terms of the Palo Alto Proposal.

16        29.   From the time of the Palo Alto Meeting through mid-July of 2006, the parties

17   failed to make any further progress towards resolving the outstanding issues under Plaintiff's

18   Contract of Employment. On or around July 19, 2006, William Luehrs e-mailed Plaintiff a

19   written proposal for resolving these issues, which contained the following terms: (a) issue Plaintiff

20   3,053 shares of ADB stock to make up for the deficiency in the number of Pre-IPO Shares

21   allegedly granted to Plaintiff (claiming that the 12,500 ESOP Shares issued to Plaintiff constituted

22   a portion of the Pre-IPO Shares); (b) pay Plaintiff the amount of $1,392,764.00 for the Discounted

23   Shares (assuming an exercise price of CHF 142.9 less CHF 25.50 [the 50% discount of the IPO

24   price] divided by the exchange rate of 1.311 multiplied by 15,553 shares); (c) retain Plaintiff to

25   assist in advanced technology projects in the field of RF technology for digital television at an

26   annual salary of $100,000.00; and (d) pay the total $1,392,764.00 owed to Plaintiff over a five-

27   year period by paying the amount of $278,553.00 into a deferred compensation plan each year of

28   a five-year period (the "July 2006 Proposal"). This proposal did not address the issue of the

1    severance payment that was owed to Plaintiff as a result of ADB's closure of its San Francisco

2    Bay Area office.  Plaintiff did not agree to the terms of the July 2006 Proposal.

3         30.    In or around May of 2007, Plaintiff was granted 3,053 ESOP Shares, valued at

4    CHF 48.30 per share.  Plaintiff is informed and believes, and thereon alleges, that like the 12,500

5    ESOP Shares issued in or around December of 2004, the 3,053 ESOP Shares are different in

6    several material respects from the Pre-IPO Shares and the Discounted Shares that were to be

7    issued to Plaintiff under his Contract of Employment.  Significantly, the 3,053 ESOP Shares are

8    restricted and cannot be sold until October 28, 2007.

9         31.    In a letter sent to Plaintiff at or around the time of the May 2007 grant, William

10   Luehrs conceded that the 3,053 ESOP Shares were part of the Pre-IPO Shares owed to Plaintiff.

11   Accordingly, to compensate Plaintiff for the tax consequences of receiving the shares at

12   CHF 48.30 per share rather than at the Swiss Tax Authority Valuation of CHF 4.30 per share,

13   ADB agreed to pay Plaintiff an additional $47,650.00 (the "Tax Liability Compensation").

14   Plaintiff, however, is informed and believes, and thereon alleges, that the Tax Liability

15   Compensation offered by ADB does not adequately compensate Plaintiff for the tax liabilities he

16   will incur due to the delayed grant of the 3,053 ESOP Shares.  The Tax Liability Compensation is

17   itself taxable income.  As a result, the net value is approximately $29,889.09.  Therefore, to fully

18   compensate Plaintiff for the additional tax liability caused by ADB's delay, the Tax Liability

19   Compensation must be increased to approximately $71,000.00.

20        32.    To date, Plaintiff and ADB have been unable to resolve any of the outstanding

21   issues under Plaintiff's Contract of Employment described herein.

22                          **FIRST CAUSE OF ACTION**

23                   (Breach of Contract –failure to issue Pre-IPO Shares)

24        33.    Plaintiff incorporates the allegations in paragraphs 1 through 30 of the complaint as

25   though set forth fully herein.

26        34.    Pursuant to the Contract of Employment attached hereto as Exhibit A, Plaintiff is

27   entitled to a number of Pre-IPO Shares equivalent to US $666,666, free of charge.  *See* Exhibit A

28

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE

591\521640.3                                              - 8 -

                                              COMPLAINT FOR DAMAGES

1  at ¶ 8(b)(i). These Pre-IPO Shares were to become fully vested, with no restrictions, upon the

2  closure of ADB's San Francisco Bay Area office. *See* Exhibit A at ¶ 13(a).

3      35.    On December 1, 2005, ADB informed Plaintiff of its decision to close its San

4  Francisco Bay Area office and, on February 28, 2006, ADB closed its San Francisco Bay Area

5  office.

6      36.    ADB breached Plaintiff's Contract of Employment by failing to issue him the Pre-

7  IPO Shares he is owed under the express terms of his Contract of Employment. These shares

8  should have been fully vested, with no restrictions, as of the office closure on February 28, 2006.

9      37.    Had ADB timely issued the Pre-IPO Shares to Plaintiff as required pursuant to the

10 express terms of his Contract of Employment, Plaintiff could have exercised these shares at or

11 around the time of the office closure. Based on the number of shares to which Plaintiff was

12 entitled under the ADB Valuation, the Pre-IPO Shares were then valued at approximately

13 $1,695,398.00. Based on the number of shares to which Plaintiff was entitled under the Swiss

14 Tax Authority Valuation, the Pre-IPO Shares were then valued at approximately $19,276,893.00.

15     38.    At all applicable times, Plaintiff has performed all conditions and covenants

16 required of him pursuant to the Contract of Employment.

17     39.    As a result of the refusal of ADB to issue him the Pre-IPO Shares described in the

18 Contract of Employment, Plaintiff has suffered damage in an amount according to proof.

19                        **SECOND CAUSE OF ACTION**

20               (Breach of Contract – failure to issue Discounted Shares)

21     40.    Plaintiff incorporates the allegations in paragraphs 1 through 37 of the complaint as

22 though set forth fully herein.

23     41.    Pursuant to the Contract of Employment attached hereto as Exhibit A, Plaintiff was

24 entitled to a number of Discounted Shares equivalent to US $666,666, at a 50% discount of the

25 share issue price. *See* Exhibit A at ¶ 8(b)(i). The Discounted Shares were to become fully vested,

26 with no restrictions, upon the closure of ADB's San Francisco Bay Area office. *See* Exhibit A at

27 ¶ 13(a).

28

42.    On December 1, 2005, ADB informed Plaintiff of its decision to close its San Francisco Bay Area office and, on February 28, 2006, ADB closed its San Francisco Bay Area office.

43.    On a number of occasions since December of 2005, ADB has acknowledged, both verbally and in writing, that it failed to issue the Discounted Shares and that Plaintiff, therefore, is entitled to compensation for the value of these Discounted Shares, in the amount of approximately $1,392,764.00.

44.    ADB breached Plaintiff's Contract of Employment by failing to issue him the Discounted Shares he is owed under the express terms of his Contract of Employment. These shares should have been fully vested, with no restrictions, as of the office closure on February 28, 2006.

45.    Had ADB timely issued the Discounted Shares to Plaintiff as required pursuant to the express terms of his Contract of Employment, Plaintiff could have exercised these shares at or around the time of the office closure. Based on the number of shares to which Plaintiff was entitled under the ADB Valuation, the Discounted Shares were then valued at approximately $1,392,860.00. Based on the number of shares to which Plaintiff was entitled under the Swiss Tax Authority Valuation, the Discounted Shares were then valued at approximately $18,982,896.00.

46.    At all applicable times, Plaintiff has performed all conditions and covenants required of him pursuant to the Contract of Employment.

47.    As a result of the refusal of ADB to issue him the Discounted Shares described in the Contract of Employment, Plaintiff has suffered damage in an amount according to proof.

### THIRD CAUSE OF ACTION

(Breach of Contract – failure to pay severance package)

48.    Plaintiff incorporates the allegations in paragraphs 1 through 45 of the complaint as though set forth fully herein.

49.    Pursuant to the Contract of Employment attached hereto as Exhibit A, Plaintiff was entitled to a severance package in the amount of one year of salary, less $44,520.00, in the event of ADB's decision to close its San Francisco Bay Area office.  *See* Exhibit A at ¶ 13(a).

50.    On December 1, 2005, ADB informed Plaintiff of its decision to close its San Francisco Bay Area office and, on February 28, 2006, ADB closed its San Francisco Bay Area office.  As a result of the office closure, Plaintiff has performed his duties for ADB out of his home in San Jose, California since March 1, 2006.

51.    At both the Denver Meeting and the Campbell Meeting, ADB acknowledged, both verbally and in writing, that Plaintiff was owed a severance payment as a result of ADB's decision to close its San Francisco Bay Area office.

52.    ADB breached Plaintiff's Contract of Employment by failing to pay him the severance package he is owed under the express terms of his Contract of Employment in the amount of $128,880.00 (based on Plaintiff's then current annual base salary of $173,400.00 less $44,520.00).

53.    At all applicable times, Plaintiff has performed all conditions and covenants required of him pursuant to the Contract of Employment.

54.    As a result of the refusal of ADB to pay him the severance package described in the Contract of Employment, Plaintiff has suffered damage in an amount according to proof.

## FOURTH CAUSE OF ACTION

(Breach of Contract – failure to provide pension benefits)

55.    Plaintiff incorporates the allegations in paragraphs 1 through 52 of the complaint as though set forth fully herein.

56.    Pursuant to the Contract of Employment attached hereto as Exhibit A, Plaintiff was eligible to participate in the Company's Pension Plan administered by Eagle Star International, on the same level as senior management of ADB Ltd., Taiwan Branch.  *See* Exhibit A at ¶ 10(b).

57.    ADB breached Plaintiff's Contract of Employment by failing to enroll him in the Company's Pension Plan and provide him with the pension benefits provided to senior

1  management of ADB Ltd., Taiwan Branch, as required under the express terms of the Contract of

2  Employment.

3      58.    At all applicable times, Plaintiff has performed all conditions and covenants

4  required of him pursuant to the Contract of Employment.

5      59.    As a result of the failure of ADB to enroll him in the Pension Plan and provide him

6  with the pension benefits described in the Contract of Employment, Plaintiff has suffered damage

7  in an amount according to proof.

8                        **FIFTH CAUSE OF ACTION**

9              (Breach of the covenant of good faith and fair dealing)

10     60.    Plaintiff incorporates the allegations in paragraphs 1 through 57 of the complaint as

11  though set forth fully herein.

12     61.    Implied within the Contract of Employment between Plaintiff and ADB is a

13  covenant of good faith and fair dealing, pursuant to which ADB was obligated to refrain from any

14  conduct which would unfairly deprive Plaintiff of the benefits of the Contract of Employment.

15     62.    By failing and refusing to issue to Plaintiff any of the Pre-IPO Shares or the

16  Discounted Shares, failing and refusing to pay Plaintiff the severance package upon the closure of

17  the San Francisco Bay Area office, and failing and refusing to enroll Plaintiff in the Company's

18  Pension Plan, ADB has breached the covenant of good faith and fair dealing by unfairly depriving

19  Plaintiff of the benefits of his Contract of Employment.

20     63.    By failing to timely issue the Pre-IPO Shares and the Discounted Shares owed to

21  Plaintiff under the Contract of Employment, ADB deprived Plaintiff of the ability to exercise the

22  Pre-IPO Shares and the Discounted Shares when they became fully vested upon the closure of the

23  San Francisco Bay Area office on February 28, 2006.  Even if ADB were to belatedly issue these

24  shares to Plaintiff now, he could not be compensated for this loss as the shares are currently

25  trading at approximately CHF 47.5, which is CHF 95.4 less than the share price at the time of the

26  office closure over one year ago, and the issues would receive less favorable tax treatment since it

27  would be classified as a short-term rather than long-term capital gain.  Additionally, a belated

28

1  stock grant would implicate larger tax liabilities since the pre-IPO Swiss Tax Authority valuation

2  was significantly lower than current market value.

3       64.   By failing to pay Plaintiff the severance payment that became due when ADB

4  closed its San Francisco Bay Area office on February 28, 2006, ADB deprived Plaintiff of the

5  benefits of his Contract of Employment. Since that time, Plaintiff has been required to perform

6  his duties for ADB from his home at a reduced salary and without certain vested contractual

7  benefits.

8       65.   By failing to enroll Plaintiff in the Company's Pension Plan, ADB deprived

9  Plaintiff any and all company contribution to such plan, and the ability to realize the gains of these

10  contributions over the last six and one-half years.

11       66.   As a result of ADB's breaches of the covenant of good faith and fair dealing,

12  Plaintiff has suffered damage in an amount according to proof.

13  <u>**SIXTH CAUSE OF ACTION**</u>

14  (Unfair Business Practices – Violation of California Business and Professions Code

15  Section 17200 *et seq.*)

16       67.   Plaintiff incorporates the allegations in paragraphs 1 through 64 of the complaint as

17  though set forth fully herein.

18       68.   ADB's continued failure and refusal to: (a) pay Plaintiff the severance package that

19  became due to him when ADB closed its San Francisco Bay Area office on February 28, 2006;

20  (b) issue Plaintiff the Pre-IPO Shares and the Discounted Shares owed to him under the express

21  terms of his Contract of Employment; and (c) enroll Plaintiff in the Company's Pension Plan and

22  provide him with the pension benefits to which he is entitled violate Section 216 of the California

23  Labor Code and constitute unfair, unlawful, and fraudulent business practices within the meaning

24  of Business & Professions Code section 17200 *et seq.*

25       69.   Plaintiff is informed and believes that ADB has engaged in the unfair, unlawful,

26  and fraudulent business practices described herein for the purpose of securing for itself a discount

27  upon its indebtedness to Plaintiff, improperly delaying payment of sums and benefits currently

28

1    due and owing to Plaintiff, and defrauding the general public by omitting information regarding

2    the debts owed to Plaintiff from its financial reports.

3         70.    Plaintiff is informed and believes that, as a result of the ADB's unfair, unlawful

4    business, and fraudulent practices as described herein, ADB has been unjustly enriched at the

5    expense of Plaintiff, the general public, and its competitors.  Plaintiff, therefore, is entitled to

6    restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits that

7    may have been obtained by ADB as a result of the unfair, unlawful, and fraudulent business

8    practices described herein.

9                    **SEVENTH CAUSE OF ACTION**

10                       (Quantum Meruit)

11         71.    Plaintiff incorporates the allegations in paragraphs 1 through 68 of the complaint as

12    though set forth fully herein.

13         72.    On or around March 1, 2006, ADB unilaterally eliminated multiple contractual

14    benefits and decreased Plaintiff's annual base salary to $100,000.00:  ADB has withheld multiple

15    contractual benefits and compensated Plaintiff at this reduced salary, without Plaintiff's consent,

16    ever since.

17         73.    Since March 1, 2006, Plaintiff has remained ADB's Director of Advanced

18    Engineering and has continued to perform the same duties for ADB that he performed prior to the

19    closure of the San Francisco Bay Area office, with the sole exception that Plaintiff is now

20    required to perform these duties primarily out of his home in San Jose, California.

21         74.    The reasonable value of Plaintiff's services to ADB as the Director of Advanced

22    Engineering from March 1, 2006 going forward is at least $173,400.00 per year, or $14,450 per

23    month, in addition to the value of the multiple contractual benefits unilaterally withheld by ADB.

24    Therefore, Plaintiff is entitled to an amount sufficient to compensate him for the reasonable value

25    of his services to ADB from March 1, 2006 going forward.

26                       **PRAYER**

27        WHEREFORE, Plaintiff Andrew Grzegorek prays that the Court:

28         1.    Award Plaintiff compensatory damages according to proof;

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE

591\521640.3

- 14 -

COMPLAINT FOR DAMAGES

2.  Award Plaintiff restitution according to proof;

3.  Award Plaintiff an amount sufficient to compensate him for the reasonable value of his services to ADB from March 1, 2006 going forward;

4.  Award Plaintiff interest according to proof;

5.  Award Plaintiff costs of suit incurred herein; and

6.  Award such other and further relief as the court deems just and proper.

Dated: October 18, 2007                    HOPKINS & CARLEY
                                           A Law Corporation

                                           By: _____
                                              Ernest M. Malaspina
                                              Attorneys for Plaintiff
                                              ANDREW GRZEGOREK

**ADB ADVANCED DIGITAL BROADCAST LIMITED**

## CONTRACT OF EMPLOYMENT

**THIS  AGREEMENT**  is executed and entered into and between

**ADVANCED DIGITAL BROADCAST, Ltd.**

a corporation of British Virgin Islands, having its registered office at Columbus Centre Building, Wickhams Cay, Road Town, Tortola, British Virgin Islands.

### Mr. ZBIGNIEW ANDREW GRZEGOREK

residing  at  500, Curie Drive, San Jose, CA 95123, USA, hereinafter called the Employee, and provides for the following terms and conditions of employment:

1. **Employment Status:**  Director of Advanced Engineering

2. **Date of Employment:**  July 1st, 2000

3. **Location of Employment:**  San Jose, CA, USA

4. **Duration of Contract:**  Open
   Notice period from either side being three (3) months.

5. **Remuneration**

   a) The Company shall pay the Employee a base salary of US$ 145,002.00 per year  divided into twelve (12) monthly payments (monthly payment being US$ 12,083.50).

   b) The base salary will be paid to Employee's bank account in San Jose, California.

   c) Base salary will be reviewed annually during the first two weeks of January. First revision will take place in January 2001.

6. **Transportation Allowance**

   a) The employee shall be entitled to a company-leased car, standard business model, US made. The company shall cover all expense of the lease. The employee shall pay back to the company an equivalent of the milage cost, covering the distance between the office and Employee's residence, as defined by the IRS.

## 7. Performance Bonus

a) The Employee will be entitled to a semi-annual Performance Bonus, according to the attainment of the objectives and company performance.

b) The bonus is payable upon completion of the Performance Review, in January and in July of each year.

c) Employee's first bonus will be due in January 2001

## 8. Stock option

a) The company shall compensate Employee for the loss of 70 (seventy) shares to which the Employee is entitled under his contract of employment with his current employer. The compensation will be paid in cash and will equal to the market value of the shares at the first day of employment.

b) The Employee shall be entitled to the following option of ADB shares:

   i. a number of shares equivalent to US$ 666,666, calculated on a basis of company valuation by an independent underwriter, within 3 month before the IPO - free of charge.

   ii. a number of shares equivalent to US$ 666,666, calculated as above, at the 50% discount of the share issue price (i.e. par value less 50%). The price is guaranteed throughout the vesting period.

c) Vesting period:

   i. At the end of each year following the year of IPO Employee shall be entitled to 25% of the total amount of shares specified in (ii) above.

   ii. At the end of the same period Employee shall be entitled to purchase up-to 25% as specified in (ii) above, at 50% of the par value price.

   iii. Please note:
   * Should the Employee decide not to buy shares at the end of any completed year, he can do so at any time thereafter. ADB shall guarantee the original price, i.e. 50% of the par value.
   * This option shall expire 30 days after the end of Employee's vesting period i.e. within 4 (four) years and 30 days from the date of company IPO.

2

9. Annual leave

The Employee will be entitled to 21 working days four weeks of leave plus U.S. statutory holidays.

## 10. Disability, Retirement Plan and Term Life Insurance

The Employee shall be entitled to the following Plans:

a) **U.S. 401k:** the company shall match annual premium, up-to a ceiling of 4% of Employee's annual salary.

b) **Company funded retirement plan:**

Employee shall be eligible to participation in the company's Pension Plan administered by Eagle Star International, on the same level as senior management of ADB Ltd., Taiwan Branch. Details will be provided within 30 days after signing of this contract.

c) **Income Protection Plan:**

The company shall pay the Employee full salary and all benefits as per this contract, within up-to six months, in case of proplonged ilness, as qualified by accredited medical authority of the USA.

d) **Long Term Disability**

- The company shall pay Long Term Disability insurance on the principles similar to employee's current insurance, provided by his current employee.

- Employee will provide the company with details of such an insurance and relevant information on his preferred insurer with 30 days from signing of this contract.

e) The company will cover the cost of temporary Life Insurance for the amount equals to one annual salary, for an actual period of a business trip.

## 11. Medical benefits

The Employee shall be entitled to the following medical benefits:

a) **Family Health Insurance:** Kaiser Permanente, as per the policy attached (approximate cost at the moment of hire: US$ 504.00

b) **Family Dental Insurance:** (to be specified — an equivalent of Employee's current insurance. Details to be provided).

3

**12. Other compensations**

a) Recognising long time service at Employee's current workplace, the company shall pay the Employee the amount of US$ 44,520.00 as a compensation of lost benefit of the severance pay.

b) The above amount will be payable in 12 (twelve) installments after joining ADB, i.e. $3,710.00 monthly.

**13. Other Conditions of Employment**

a) Should ADB terminate the employment for a reason other than criminal misconduct, or should the company decide to close its facility in the San Francisco Bay Area, the company shall pay the Employee a severance package in the amount of 1 year of salary less the amount paid as per item 12a above. In either of such cases, the Employee shall also become fully vested in all stocks.

b) In case of sale of ADB to a non-publicly traded third party, the company shall guarantee the Employee the amount of shares of the acquiring company, of a value equal to U.S.$ 1,333,333 and on the same vesting schedule and principles as specified in 8c.

**14. Obligation**

a) The Employee shall diligently, carefully and faithfully discharge his duties to the best of his ability and judgment under the directions, guidance and instructions of the President, or any other persons lawfully authorize by the Company.

b) The Employee shall not enter into the service or employment of any person/persons or engaged in any other trade or business of whatever kind, scope or extent, but shall give his entire and exclusive time and attention to the Company during the life of this Contract.

Advanced Digital Broadcast Ltd.                                    Employee

Christina Chang                                                    Andrew Zbigniew Grzegorek
Director, Human Resources.

Date: August 8th/00                                                Date: May 24, 2000

Andrew N. Rybicki
President & CEO.

Date: May 24/00

4

# ADB ADVANCED DIGITAL BROADCAST LIMITED

## EMPLOYEE AGREEMENT

Employee's Full Name: **Andrew Zbigniew Grzegorek**

I, the undersigned, recognizing the importance of protecting the Company's rights to inventions, propriety, and confidential information; and any similar or related rights; in consideration of my employment by the company, agree as follows:

## 1. DEFINITIONS

For the purposes of this Agreement:

a) The Company means **Advanced Digital Broadcast Limited** and its entire parent, subsidiary or afflicted corporations.

b) Invention means any invention, idea (including those which are or may be subject to patent or copyright protection) relating to those areas of existing business interests of the Company (all areas of microelectronics) made anywhere by me alone or with others during the period of my employment.

c) Proprietary/Confidential Information means any information or material, not generally known, relating to the Company's business which is not readily disclosed by inspection of the Company's products and which has been expressly or implicitly protected by the Company from unrestricted use by unauthorized persons including, but not limited to, trade secrets and inventions.

d) Proprietary Information includes information contained relating to the Company's product designs, hardware, software, manufacturing methods, processes, quality information, techniques, treatment or chemical composition of material, plant layout, tooling, marketing plans or proposals, business forecasts, competitive analyses, pricing policies, other internal policies and employee, customer, vendor, consultants and independent contractor lists or any information relating to such parties.

## 2. OWNERSHIP OF INVENTIONS

a) I agree to promptly disclose to the company in writing all inventions generated, conceived, or first reduced to practice by me alone or in conjunction with others during the period of my employment with the Company.

I agree that any patent application related specifically to the Company business filed within a year after termination of my employment shall be presumed to relate to an invention, which was made during the term of my employment.

All Inventions are the exclusive property of the Company and the Company shall have the right to keep any Invention as trade secrets if the Company chooses.

b) I hereby assign and agree to assign to the Company, all my rights, titles, throughout the world, in and to Inventions, conceived or made by me either solely or jointly with others while an employee of the company.

c) I acknowledge and agree that the copyright and any other intellectual property right in designs, software, and related documentation, and works of authorship, created during the period of my employment and relating to the existing business interests of the Company (all areas of digital and/or pay television, and satellite, cable or terrestrial transmission and reception of television and Internet signals), belong to the Company.

d) There shall be no obligation on the Company or any of its direct or indirect licenses to designate me as any owner of any design, software, or related documentation or other work or authorship assigned in paragraph (b) above when distributed publicly or otherwise, nor to make any distribution.

## 3. PROPRIETARY/CONFIDENTIAL INFORMATION

I agree that I will promptly disclose in writing to the Company all Proprietary/Confidential Information developed by me. All Proprietary and/or Confidential Information that I develop or which comes into my possession through my employment shall be and remain the exclusive property of the Company.

## 4. NON-DISCLOSURE OF PROPRIETARY/CONFIDENTIAL INFORMATION

Unless authorized in writing by the Company, I will maintain all Proprietary/Confidential Information in confidence and, except in conjunction with my work for the Company, will not copy or make notes of, divulge to anyone outside the Company or use any of the Proprietary/Confidential Information for my own or another's benefit, either during or after the term of my employment by the Company. This same obligation shall apply to Proprietary/Confidential Information of another party, which I receive in the normal course of my employment with the Company.

2

## 5. DOCUMENTS, MATERIALS, AND TANGIBLE PROPERTY

All document, materials and other tangible property, relating in any way to the business of the Company which are generated by me or any such documents, materials, and tangible property not made available generally to the public, which come into my possession during my employment, from the Company or its customers or its affiliates, shall be and remain the exclusive property of the Company, and I agree to return the same to the Company on termination of my employment or at such earlier time as requested by the Company.

## 6. UNFAIR COMPETITIVE ACTIVITIES

a) During my employment, I will not plan, organize, or engage in any business competitive with any product or service marketed or planned for marketing by the Company or conspire with others to do so.

b) For one yea after termination for any reason of my employment with the Company, I will not directly or indirectly solicit Company employees for competitive employment.

c) After termination for any reason of my employment with the Company, I will not attempt to divert any Company business to products competitive with the Company's products through unfair business practices.

## 7. CONFLICT OF INTEREST

a) I affirm that I am involved in no situation which might create or appear to create a conflict of interest, including but not limited to:

- Being connected directly or indirectly with any business as owner, participant, licensee, consultant, shareholder or as the recipient of wages, commissions or other compensation of value) which sells or provides materials, equipment, facilities or services to the Company or its competitors; which is direct or indirect competition with the Company; or which is a customer of the Company (Shares or stock in listed companies acquired as part of a normal investment program are excluded)

- Acquiring directly or indirectly through ownership or lease any property, real estate, or facilities in which the Company has an active or known potential interest.

- Speculating or commercially dealing in the products (e.g. new, used, obsolete, or scrap) sold by the Company or in any used property (e.g. equipment, facilities and furniture) of the Company.

3

b) I agree that during my employment with the Company, I will report immediately any gifts, services and any other personal favors or preferments given to or received from anyone with whom the Company has or is likely to have any business dealings, including any employee, prospective employee, customer, competitor, or vendor, which go beyond common courtesies usually associated with accepted business practice.

c) I further agree to report immediately any circumstances or situations arising in the future that might involve me or appear to involve me in a conflict of interest.

## 8. PUBLISHING

Except as may be approved by the Company in writing, I will not during the time of my employment publish anything in the Company's area of interests.

## 9. MISCELLANEOUS

a) Waiver – The Company's waiver or failure to enforce any violation or provision of this Agreement shall not constitute a waiver of its rights hereunder with respect to any other violation or provision f this agreement.

b) Governing Law – This Agreement and any disputes arising under or in connection with it, shall be governed by the applicable laws of the territory in which the Company is located and operates in.

I have read and understood the entire foregoing Employee Agreement and I understand that by signing I am agreeing to all above statements, requirement, and obligations in regard to inventions made by me, treatment of Company property and information, activities by me which might be considered to be unfair competition or to create a conflict of interest, and all other subjects addressed above.

_____
Employee's Signature                    Date

Accepted for Advanced Digital Broadcast Ltd.: _____ Date: _____

4

# EXHIBIT B

# CIVIL LAWSUIT NOTICE

**Superior Court of California, County of Santa Clara**
**191 N. First St., San Jose, CA 95113**

CASE NUMBER:

ATTACHMENT CV-5012

## 1 0 7 C V 0 9 6 8 9 1

---

### READ THIS ENTIRE FORM

---

**PLAINTIFFS** (the person(s) suing): Within 60 days after filing the lawsuit, you must serve each defendant with the *Complaint*, *Summons*, an *Alternative Dispute Resolution (ADR) Information Sheet*, and a copy of this *Civil Lawsuit Notice*, and you must file written proof of such service.

---

**DEFENDANTS** (The person(s) being sued): You must do each of the following to protect your rights:

1. You must file a written response to the *Complaint*, in the Clerk's Office of the Court, within 30 days of the date the *Summons* and *Complaint* were served on you;
2. You must send a copy of your written response to the plaintiff; and
3. You must attend the first Case Management Conference.

**Warning:** If you do not do these three things, you may automatically lose this case.

---

**RULES AND FORMS:** You must follow the California Rules of Court (CRC) and the Santa Clara County Superior Court Local Civil Rules and use proper forms. You can get legal information, view the rules and get forms, free of charge, from the Self-Service Center at 99 Notre Dame Avenue, San Jose (408-882-2900 x-2926), or from:

- State Rules and Judicial Council Forms: www.courtinfo.ca.gov/forms and www.courtinfo.ca.gov/rules
- Local Rules and Forms: http://www.scccuperiorcourt.org/civil/rule1toc.htm
- Rose Printing: 408-293-8177 or becky@rose-printing.com (there is a charge for forms)

For other local legal information, visit the Court's Self-Service website www.scselfservice.org and select "Civil."

**CASE MANAGEMENT CONFERENCE (CMC):** You must meet with the other parties and discuss the case, in person or by telephone, at least 30 calendar days before the CMC. You must also fill out, file and serve a *Case Management Statement* (Judicial Council form CM-110) at least 15 calendar days before the CMC.

You or your attorney must appear at the CMC. You may ask to appear by telephone—see Local Civil Rule 8.

---

Your Case Management Judge is: **Kevin Murphy**                    Department: **22**

The 1st CMC is scheduled for: (Completed by Clerk of Court)

Date: **MAR 1 1 2008**    Time: **3:00pm**    in Department    **22**

The next CMC is scheduled for: (Completed by party if the 1st CMC was continued or has passed)

Date: _____    Time: _____    in Department _____

---

**ALTERNATIVE DISPUTE RESOLUTION (ADR):** If all parties have appeared and filed a completed *ADR Stipulation Form* (local form CV-5008) at least 15 days before the CMC, the Court will cancel the CMC and mail notice of an ADR Status Conference. Visit the Court's website at www.scccuperiorcourt.org/civil/ADR/ or call the ADR Administrator (408-882-2100 x-2530) for a list of ADR providers and their qualifications, services, and fees.

**WARNING:** Sanctions may be imposed if you do not follow the California Rules of Court or the Local Rules of Court.

---

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF SANTA CLARA
## ALTERNATIVE DISPUTE RESOLUTION
### INFORMATION SHEET / CIVIL DIVISION

Many cases can be resolved to the satisfaction of all parties without the necessity of traditional litigation, which can be expensive, time consuming, and stressful. The Court finds that it is in the best interests of the parties that they participate in alternatives to traditional litigation, including arbitration, mediation, neutral evaluation, special masters and referees, and settlement conferences. Therefore, all matters shall be referred to an appropriate form of Alternative Dispute Resolution (ADR) before they are set for trial, unless there is good cause to dispense with the ADR requirement.

*What is ADR?*

ADR is the general term for a wide variety of dispute resolution processes that are alternatives to litigation. Types of ADR processes include mediation, arbitration, neutral evaluation, special masters and referees, and settlement conferences, among others forms.

*What are the advantages of choosing ADR instead of litigation?*

ADR can have a number of advantages over litigation.

< **ADR can save time.** A dispute can be resolved in a matter of months, or even weeks, while litigation can take years.

< **ADR can save money.** Attorney's fees, court costs, and expert fees can be reduced or avoided altogether.

< **ADR provides more participation.** Parties have more opportunities with ADR to express their interests and concerns, instead of focusing exclusively on legal rights.

< **ADR provides more control and flexibility.** Parties can choose the ADR process that is most likely to bring a satisfactory resolution to their dispute.

< **ADR can reduce stress.** ADR encourages cooperation and communication, while discouraging the adversarial atmosphere of litigation. Surveys of parties who have participated in an ADR process have found much greater satisfaction than with parties who have gone through litigation.

*What are the main forms of ADR offered by the Court?*

< **Mediation** is an informal, confidential process in which a neutral party (the mediator) assists the parties in understanding their own interests, the interests of the other parties and the practical and legal realities they all face. The mediator then helps the parties to explore options and arrive at a mutually acceptable resolution of the dispute. The mediator does not decide the dispute. The parties do.

Mediation may be appropriate when:
< The parties want a non-adversary procedure
< The parties have a continuing business or personal relationship
< Communication problems are interfering with a resolution
< There is an emotional element involved
< The parties are interested in an injunction, consent decree, or other form of equitable relief

-over-

CV-5003 REV 5/06

<    Arbitration is a normally informal process in which the neutral (the arbitrator) decides the dispute after hearing the evidence and arguments of the parties. The parties can agree to binding or non-binding arbitration. Binding arbitration is designed to give the parties a resolution of their dispute when they cannot agree by themselves or with a mediator. If the arbitration is non-binding, any party can reject the arbitrator's decision and request a trial.

Arbitration may be appropriate when:

- <    The action is for personal injury, property damage, or breach of contract
- <    Only monetary damages are sought
- <    Witness testimony, under oath, is desired
- <    An advisory opinion is sought from an experienced litigator (if a non-binding arbitration)

<    Neutral evaluation is an informal process in which a neutral party (the evaluator) reviews the case with counsel and gives a non-binding assessment of the strengths and weaknesses on each side and the likely outcome. The neutral can help parties to identify issues, prepare stipulations, and draft discovery plans. The parties may use the neutral's evaluation to discuss settlement.

Neutral evaluation may be appropriate when:

- <    The parties are far apart in their view of the law or value of the case
- <    The case involves a technical issue in which the evaluator has expertise
- <    Case planning assistance would be helpful and would save legal fees and costs
- <    The parties are interested in an injunction, consent decree, or other form of equitable relief

<    Special masters and referees are neutral parties who may be appointed by the court to obtain information or to make specific fact findings that may lead to a resolution of a dispute.

Special masters and referees can be particularly effective in complex cases with a number of parties, like construction disputes.

<    Settlement conferences are informal processes in which the neutral (a judge or an experienced attorney) meets with the parties or their attorneys, hears the facts of the dispute, and normally suggests a resolution that the parties may accept or use as a basis for further negotiations.

Settlement conferences can be effective when the authority or expertise of the judge or experienced attorney may help the parties reach a resolution.

*What kind of disputes can be resolved by ADR?*

   Although some disputes must go to court, almost any dispute can be resolved through ADR. This includes disputes involving business matters; civil rights; corporations; construction; consumer protection; contracts; copyrights; defamation; disabilities; discrimination; employment; environmental problems; harassment; health care; housing; insurance; intellectual property; labor; landlord/tenant; media; medical malpractice and other professional negligence; neighborhood problems; partnerships; patents; personal injury; probate; product liability; property damage; real estate; securities; and sports, among other matters.

*Where can you get assistance with selecting an appropriate form of ADR and a neutral for your case, for information about ADR procedures, or for other questions about ADR?*

Contact:

Santa Clara County Superior Court        Santa Clara County DRPA Coordinator
ADR Administrator                        .408-792-2704
408-882-2530

ALTERNATIVE DISPUTE RESOLUTION INFORMATION SHEET/CIVIL DIVISION

# EXHIBIT C

U.S. Department of Justice
United States Marshals Service



# REQUEST
# FOR SERVICE ABROAD OF JUDICIAL OR EXTRAJUDICIAL DOCUMENTS

*DEMANDE*
*AUX FINS DE SIGNIFICATION OU DE NOTIFICATION À L'ETRANGER*
*D'UN ACTE JUDICIAIRE OU EXTRAJUDICIAIRE*

Convention on the service abroad of judicial and extrajudicial documents in civil or
commercial matters, signed at The Hague, November 15, 1965.
*Convention relative à la signification et à la notification à l'étranger des actes judiciaires ou*
*extrajudiciaires en matière civile ou commerciale, signée à La Haye, le 15 novembre 1965.*

| Identity and address of the applicant *Identité et adresse du requérant* | Address of receiving authority *Adresse de l'autorité destinataire* |
|---|---|
| Ernest M. Malaspina (State Bar No. 187946) On behalf of Andrew Grzegorek Hopkins & Carley, a LC P. O. Box 1469 San Jose, CA 95109-1469 | Parquet du Procureur général Place du Bourg-de-Four 1 Case postale 3565 1211 Genève 3 |

The undersigned applicant has the honour to transmit -- in duplicate-- the documents listed below and, in conformity
with article 5 of the above-mentioned Convention, requests prompt service of one copy thereof on the addressee, i.e.,
(identity and address)
*Le requérant soussignée a l'honneur de faire parvenir--en double exemplaire--à l'autorité destinataire les documents ci-dessous*
*énumérés, en la priant, conformément à l'article 5 de la Convention précitée, d'en faire remettre sans retard un exemplaire au*
*destinataire, à savoir:*
*(identité et adresse)*

Advanced Digital Broadcast Holdings SA

Avenue de Tournay 7 1292 Chambésy Switzerland

[X] (a) in accordance with the provisions of sub-paragraph (a) of the first paragraph of article 5 of the Convention.*
   *a) selon les formes légales (article 5 alinéa premier, lettre a).*

[ ] (b) in accordance with the following particular method (sub-paragraph (b) of the first paragraph of article 5)*:
   *b) selon la forme particulière suivante (article 5, alinéa premier, lettre b) :*

[ ] (c) by delivery to the addressee, if he accepts it voluntarily (second paragraph of article 5)*:
   *c) le cas échéant, par remise simple (article 5, alinéa 2).*

The authority is requested to return or to have returned to the applicant a copy of the documents and of the annexes
with a certificate as provided on the reverse side.
*Cette autorité est priée de renvoyer ou de faire renvoyer au requérant un exemplaire de l'acte - et de ses annexes - avec*
*l'attestation figurant au verso.*

List of documents
*Enumération des pièces*

Complaint, English & French Translation
Summons, English & French Translation
Civil Lawsuit Notice, English & French Translation
Original notarized certification by translator

Done at _____ , the
*Fait à* _____ , *le*

Signature and/or stamp
*Signature et/ou cachet*

Ernest M. Malaspina

*Delete if inappropriate
Rayer les mentions inutiles.*

Form USM-94
Est. 11/77
(Formerly OBD-116, which was formerly LAA-116, both of which may still be used)

**CERTIFICATE**
*ATTESTATION*

The undersigned authority has the honour to certify, in conformity with article 6 of the Convention,
*L'autorité soussignée a l'honneur d'attester conformément à l'article 6 de ladite Convention,*

1) that the document has been served *
*1) que la demande a été exécutée*
— the (date) -- *le (date)* _____
-- at (place, street, number) - *à (localité, rue, numéro)* _____

— in one of the following methods authorized by article 5:
*— dans une des formes suivantes prévues à l'article 5:*

☐ (a) in accordance with the provisions of sub-paragraph (a) of the first paragraph of article 5 of the Convention*.
*a) selon les formes légales (article 5, alinéa premier, lettre a)*

☐ (b) in accordance with the following particular method:
*b) selon la forme particulière suivante:* _____

☐ (c) by delivery to the addressee, who accepted it voluntarily.*
*c) par remise simple.*

The documents referred to in the request have been delivered to:
*Les documents mentionnés dans la demande ont été remis à:*
- (identity and description of person)
- *(Identité et qualité de la personne)*

- relationship to the addressee family, business or other
- *liens de parenté de subordination ou autres avec le destinataire de l'acte:*

2) that the document has not been served, by reason of the following facts*:
*2) que la demande n'a pas été exécutée, en raison des faits suivants:*

In conformity with the second paragraph of article 12 of the Convention, the applicant is requested to pay or reimburse the expenses detailed in the attached statement*
*Conformément à l'article 12, alinéa 2, de ladite Convention, le requérant est prié de payer ou de rembourser les frais dont le détail figure au mémoire ci-joint.*

ANNEXES
*Annexes*

Documents returned:
*Pieces renvoyées*

_____
_____
_____

In appropriate cases, documents establishing the service:
*Le cas échéant, les documents justificatifs de l'exécution:*

_____
_____

Done at _____ , the
*Fait à* _____ , *le* _____

Signature and/or stamp
*Signature et/ou cachet*

## SUMMARY OF THE DOCUMENT TO BE SERVED
### *ÉLÉMENTS ESSENTIELS DE L'ACTE*

**Convention on the service abroad of judicial and extrajudicial documents in civil or commercial matters, signed at The Hague, November 15, 1965.**

*Convention relative à la signification et à la notification à l'étranger des actes judiciaires ou extrajudiciaires en matière civile ou commerciale, signée à La Haye, le 15 novembre 1965.*

**(article 5, fourth paragraph)**
*(article 5, alinéa quatre)*

**Name and address of the requesting authority:**
*Nom et adresse de l'autorité requérante:*

Ernest M. Malaspina, For Andrew Grzegorek, Hopkins & Carley, a LC P. O. Box 1469 San Jose, CA 95109

Santa Clara County Superior Court, 191 North First Street, San Jose, CA 95113
**Particulars of the parties:**
*Identité des parties:*

Andrew Grzegorek v. Advanced Digital Broadcast Holdings SA

### JUDICIAL DOCUMENT
### *ACTE JUDICIA IRE*

**Nature and purpose of the document:**
*Nature et objet de l'acte:*

Complaint for Damages, Summons and Civil Lawsuit Notice

**Nature and purpose of the proceedings and, where appropriate, the amount in dispute:**
*Nature et objet de l'instance, le cas échéant, le montant du litige:*

See Attachment A hereto.

**Date and place for entering appearance:**
*Date et lieu de la comparution:*

See Attachment B hereto.

**Court which has given judgment**:**
*Juridiction qui a rendu la décision:*

**Dale of judgment**:**
*Date de la décision:*

**Time limits stated in the document**:**
*Indication des délais figurant dans l'acte:*

### EXTRAJUDICIAL DOCUMENT
### *ACTE EXTRAJUDICIAIRE*

**Nature and purpose of the document:**
*Nature et objet de l'acte:*

**Time limits stated in the document:**
*Indication des délais figurant dans l'acte:*

<u>ATTACHMENT "A" TO FORM USM-94</u>

Nature and Purpose of Proceedings and, where appropriate the amount in dispute:
*Nature et objet de l'instance, le cas echeant, le montant du litige:*

1.        **COMPLAINT FOR DAMAGES FOR:**

        1.  **Breach of Contract (failure to issue Pre-IPO Shares);**

        2.  **Breach of Contract (failure to issue Discounted Shares);**

        3.  **Breach of Contract (failure to pay severance package);**

        4.  **Breach of Contract (failure to provide pension benefits);**

        5.  **Breach of the covenant of good faith and fair dealing;**

        6.  **Unfair Business Practices; and**

        7.  **Quantum Meruit.**

2.        **DAMAGES ACCORDING TO PROOF**

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE

436\561129.1

## ATTACHMENT "B" TO FORM USM-94

Date and Place for Entering Appearance:

*Date et lieu de la comparution:*

An answer must be served on counsel for plaintiff, within 30 days of service of the complaint, summons and civil lawsuit notice.

A Case Management Conference is scheduled for March 11, 2008 at 3:00 p.m. in Dept. 2 at the Santa Clara County Superior Court located at 191 North First Street, San Jose, California 95113.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE

436\561176.1